## *DAVID REUS PERMANENT LOAN AND SAVINGS CO. *vs.* J. FRED. CONRAD, JR., ADMINISTRATOR OF P. T. MILLER.

*Liability of Officer of Corporation For Mismanagement of its Affairs.*

The bill in this case was filed by a Loan Company against its President alleging that a loss had been occasioned to the company by mortgage loans made by him as President upon property to which the borrower had not a clear title and that the management of the defendant in making the loans had been fraudulent and grossly negligent. *Held*, that the evidence fails to establish the truth of the allegations of the bill and that the defendant is not liable to make good the loss so occasioned.

Appeal from the Circuit Court for Baltimore City (DENNIS J.)

---

*As to liability of directors to corporation for their acts and omissions see note to *Bosworth* v. *Allen*, 55 L. R. A. 751.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PEARCE, SCHMUCKER and JONES, JJ.

*Harry M. Benzinger* and *Thomas Mackenzie*, for the appellant.

*J. Fred. Conrad, Jr.*, and *W. Frank Tucker*, for the appellee.

JONES, J., delivered the opinion of the Court.

The appellant in this case is a corporation of the class known as "Building or Homestead Associations," organized under the general incorporation law for the purpose, as expressed in its articles of incorporation in evidence, of "advancing money for the purchase of houses and lands and for the improvement of premises, dwelling houses, &c., and also to advance money on approved security by mortgage to members and others." The charter bears date the 13th of February, 1872, and provides for the management of the affairs of the corporation by a board of nine directors. Peter T. Miller was one of the incorporators and subsequently became one of the directors and the president of the board. He was the original defendant in the case below, but having died during its pendency, his administrator became the party defendant below and is the appellee here.

The case originated in a bill in equity filed, on the 10th of January, 1903, in the Circuit Court of Baltimore City by the appellant against the said Miller to obtain from him an account of, and payment over to the appellant, of certain monies which, it was alleged, had been intrusted to him for investment; and which had been lost to the appellant by reason of his acceptance, as security for the same, of a mortgage upon property the title to which he knew to be defective. The bill is voluminous but the material averments may be briefly stated. After alleging that the duties of the president of the appellant consisted of "a general superintendence and control over all the affairs of the corporation; the. execution of all orders of the board of directors which may be committed to him; and the carrying into effect all measures which the board

of directors may adopt in the management of the affairs of said corporation;" and that Peter Miller was elected president of the corporation, the bill states that in the year 1881 one Mrs. Osborne applied to the appellant for a loan of $1,000 and offered as security for the loan of said amount a mortgage on certain leasehold property held by her, and situated on Mc-Mechen street in the city of Baltimore; that after an investigation by the appellant through a committee as to the sufficiency of the security offered it was decided to make the loan subject to final approval, and the passing of the title to said property by the appellant's solicitor; that it subsequently developed that in the year 1879 Mrs. Osborne had mortgaged the property, which she offered to the appellant as security for the loan applied for, to the Monumental Fire Insurance Company of Baltimore to secure a loan to her by that corporation of $3,200; that this mortgage had been paid off with the proceeds of property which her husband had conveyed in fraud of creditors; that at the time of the application to the appellant for the loan of the $1,000 there was pending a suit brought by certain creditors of her husband, who was then deceased, having for its object, among other things, the sale of the said McMechen street property "to satisfy the equitable lien" of the suing creditors; that the solicitor of the appellant in investigating the title to the said McMechen street property discovered the pendency of the said creditors' suit, and being unwilling to pass or approve the title of said * * * property, so reported * * to the defendant, Peter T. Miller, as was the uniform custom and practice in such matters, stating to said Miller that he would decline to pass or approve the title;" that the said Miller "who had previously been trusted with the money to effect the said loan as was the custom and practice in such cases thereupon took upon himself without the knowledge or consent of the plaintiff (appellant) the responsibility of consummating said loan of $1,000 and paying the money to said Mrs. Osborne and accepting her mortgage therefor as security and placed the same on record" and received therefor his fee of $1.50 as provided in appellant's by-

laws; that in the year 1884 the said Mrs. Osborne applied for a further loan of $300 upon the same property as security and upon investigation of the title thereto by the then solicitor for the appellant it was found that the said creditors' suit was still pending; that the said solicitor reported this to the said Peter T. Miller "and declined to pass the title;" but the said Miller accepted the said property as security and made the loan applied for, placed the mortgage on record and received his fee of $1.50 tor his services; "that it was the uniform practice and custom of long sanction by the board of directors for the solicitor to make his report in the matter of examination of titles to property offered for mortgage security to the president of the board and not to the board of directors or to the meetings thereof;" and that the defendant, Miller, never reported the fact to the board of directors nor to any of them that the title to the property, thus offered as security for the loan authorized by the board of directors, had been "found defective or had been turned down by the respective solicitors nor that the equity proceeding" in the said creditors' suit "was hanging as a *lis pendens* over said property."

It is then charged "that by management, by manoeuvering, by trickery and with artifice and fraud the defendant (Miller) concealed from and kept the said body corporate (appellant) and the board of directors thereof and the members thereof ignorant of the true and actual state of facts and circumstances under which the said loans were made to Alice Osborne and the said two sums of one thousand, and three hundred dollars respectively paid to her, and especially that the title to said property had not been approved first by the said corporation solicitor, Abraham Sharp, Esq., and afterwards by Frederick Leist, its succeeding solicitor, but had been actually rejected by them." The bill further alleges that default having been made by Mrs. Osborne in the mortgages given to secure the loans to her, the same were foreclosed and the appellant became the purchaser of the mortgaged property, and was afterwards made a party to the pending creditors' suit wherein it was finally decided and decreed that the said property was

liable to the creditors of the husband of the said Mrs. Osborne for monies appropriated by her which properly belonged to his estate as heretofore mentioned; and that thereby the aggregate amount of the two loans made to Mrs. Osborne was wholly lost to the appellant save only the sum of something over $500 which had been repaid on said loans; besides which the appellant was subjected to further loss by reason of certain costs incurred and of being held to account for the use and occupation of the mortgaged premises from the time of acquiring the same at the foreclosure sale; and of having to indemnify the party to whom the appellant had made sale of the property in question with an agreement for indemnity. The bill concludes with a prayer for an account to be taken under the direction of the Court of the said alleged "claims and indebtedness" of the defendant and for further relief. Miller having failed to answer the bill within the time limited by the rules of practice a decree *pro confesso* was entered against him, but this having been stricken out with leave to answer upon his application, he filed an answer to the bill which put in issue all the facts therein alleged which had particular reference to his connection with loss sustained by the appellant as alleged in the bill.

Testimony was then taken by both sides in addition to testimony which had been taken by the appellant under the decree *pro confesso* and the contention between the parties is mainly as to the effect of the proofs in the cause. Aside from certain minor questions there may be said to be no dispute as to any legal proposition. The meritorious question to be determined is did the acts of Peter T. Miller in connection with the loss sustained by the appellant as alleged and proved impose upon him a liability to the appellant for such loss? Before examining the proof submitted upon this question we may refer briefly to the standard by which it is to be tested according to what seems to be the settled law and as to which we understand no dispute is here raised.

In the well-considered case in this Court of *Booth* v. *Robinson*, 55 Md. 419, JUDGE ALVEY in the course of an exhausive

opinion treating upon the liability of directors and managers of a corporation such as is here sought to be enforced, says (adopting the doctrine laid down in the case of *Overend* v. *Gurney*, L. R. 4 Ch. 701), "facts which may show imprudence in the exercise of powers clearly conferred upon directors will not subject them to personal responsibility; but if the imprudence be so great and manifest as to amount to *crassa negligentia*, and consequently a breach of trust, personal responsibility will be incurred. Indeed all the cases agree that directors are not liable for the consequences of unwise or indiscreet management, if their conduct is entirely due' to mere default or mistakes of judgment. And the *onus* of proof of fraud, combination or gross negligence, to render the directors personally liable, is upon the party making the charge, and the proof must be clear and manifest." In 10 *Cyc.*, title Corporations, 830, the doctrine in question is expressed in this language as a result of the authorities; "none of the decisions exacts more than reasonable business knowledge, and skill, strict good faith, and a reasonable measure of care and diligence under the circumstances of the particular case." It may be further said that inasmuch as the bill in this case charges trickery, artifice and fraud in the conduct of the defendant therein as entering into and giving character to the act complained of, and which caused the loss to the appellant the "motive and intent" with which the act was done is, here, as it was said to be in the case of *Booth* v. *Robinson*, *supra*, a material inquiry; and the alleged loss having been "occasioned by conduct willfully fraudulent in intent and purpose," according to these allegations, the proof in support of them "must be other than mere constructive fraud or breaches of trust; there must be affirmative proof of the misconduct charged, going to establish fraud in fact."

Now as to the proofs the only evidence offered by the appellant going directly to the allegations of "trickery, artifice and fraud" is that elicited by a general question to one of the witnesses, who testified that he was an original incorporator in the appellant company, was its secretary at the time of the

loans to Mrs. Osborne and had continued to be ever since, whether he had carefully read over the sections of the bill of complaint making these charges and what he had to say in regard to them, to which he answered that he had read the bill and that "the facts in those sections are true and correct as therein stated." No such broad assertion, unsupported by a single fact or circumstance given as showing, or tending to show, the ground or reason upon which it could be justified, is to be accepted, or even given weight, as proof of the allegations referred to. This same witness testified that the records of the company showed that Mr. Leist, the solicitor of the appellant at the time the $300 loan was made, had passed the title. If this evidence was intended to show that the record was contrary to the fact, in view of other evidence going to show that the solicitor named had not so passed the title, there is no proof whatever to show Miller's connection with the state of record. It is difficult to conceive what motive Miller could have had to practice artifice and fraud upon the corporation that was to subject it to loss. There is no suggestion that the act complained of was productive of any advantage or benefit, of any sort, to him. On the contrary it appears that he was the largest stockholder in the appellant company and therefore the one upon whom any loss sustained by the corporation would fall most heavily. This would seem to be a sufficient reason, in the absence of very clear proof to the contrary, for supposing that he could not have been influenced by any motive to willfully put the corporation in a position to be subjected to loss; and that he would be restrained from putting it in danger of loss by any reckless and ill-considered act.

There is nothing to militate against these considerations. On the contrary there is much to support them. He was one of the incorporators of the appellant company. Was one of the directors and its president for twenty-nine years. The corporation had prospered. There is evidence that he had been influential in its management; and that his financial and official connection with it had contributed to its growth and

success.   In the course of this connection there appears no other instance of loss to the corporation in any act of his connected with an investment of its monies.   In view of this if, in the single, isolated instance of the act giving rise to the case at bar, he, from a fraudulent motive or in willful recklessness, subjected the corporation to loss the proof ought to make this "clear and manifest."   In this the proof entirely fails.   At the most it shows nothing more than that in the act which the appellant makes the basis of the present suit, the appellee's intestate was imprudent and indiscreet.   At the time the loans were made which resulted in the loss to the appellant that is the subject of this controversy the facts, in the pending creditors' suit which, in its final outcome, was the occasion of the loss, had not developed.   All that anybody could know of it was that the suit was pending, and the allegations upon which it was based.   There may, very readily, have been an honest belief that it could not result successfully while it may be freely admitted it was not wise or discreet to make that belief the basis of a business transaction that might be affected by its outcome.   This suit was pending in 1881.   It did not terminate in a decree establishing the right of the creditors, who were suing, to have the mortgaged property, which the appellant held as security for its loans, subjected to the payment of their claims, until shortly before the institution of the proceedings in the case at bar in January, 1903.   That it was so long in being brought to a conclusion goes to show that at the time of its institution the truth of the alleged facts upon which it was based could not have been very manifest even to those asserting them.   Miller was not a lawyer and therefore did not appreciate as a lawyer would the effect of a *lis pendens* in the circumstances in which he was acting; and it does not appear that he had this fully explained to him.

The solicitors of the appellant who, at the time of the loans, had in charge the interests of the appellant in the matter of title to the property offered as security, both of them intelligent and capable lawyers and evidently intending to be careful, were, it would seem, not impressed with the idea that the

pendency of the creditors' suit was a matter of very serious gravity or they would not have allowed the loans to be perfected at all. How it would result depended upon the ability of the suing creditors to establish the facts they were alleging and as to this there seemed to be an impression that they would fail. The first that Miller heard of the *lis pendens* was when he went with the mortgagor to Mr. Sharp's office to execute the mortgage and consummate the loan of the $1,000. He then learned only that this suit was pending and was told by Mr. Sharp that he (Sharp) would not be responsible for title under the circumstances; but Mr. Sharp evidently did not regard the *lis pendens* as something that would necessarily and absolutely defeat the proposed transaction because he had the mortgage already prepared for execution. There then seemed to be some hesitation about the consummation of the transaction. At least the execution of the mortgage was suspended until Mr. Sharp went out to make inquiry, as to the pending suit, of the lawyers who had charge of it for the defendants thereto and found, as he testified, that the parties, with whom he had conferences, did not think it amounted to much—"that since a long period * * * had elapsed since anything had been done * * * that it in all probability would end where it was, and that no further steps would be taken." It was upon his report to Miller after these conferences that Miller allowed the mortgage for the $1,000 to be executed. It can be seen that Miller's action could have been taken under the circumstances in perfect good faith even though it might not have been the exercise of the best judgment. The same considerations apply to the loan of the $300 when the *lis pendens* was again reported to him because he had already gotten the information mentioned from Mr. Sharp to whom he sent Mr. Leist for information. Besides this the creditors' suit had been standing still longer at that time and the idea that nothing further would probably be done was naturally strengthened. This latter however cannot perhaps be even characterized as an unwise transaction since there is testimony to the effect that ground rent and taxes were due on

the mortgaged property which the appellant would have had to pay in any event and which the $300 was designed to pay. A chance was thus afforded to get at least a part of it back. That the directors of the appellant company, some of whom testified in the case shared, to a certain extent in the feeling of security from loss on account of the creditors' suit, is made evident by the fact that as late as 1896 a proposition came to them to compromise the same for about one-seventh of the amount for which the appellant subsequently became liable under the decree therein, and it was refused. The excuse they give for this, that Miller dominated in the matter to the extent of preventing them from expressing and giving effect to their own judgment is puerile and unworthy of consideration. Such being the conclusions reached upon the merits of the controversy the minor questions which the case presents become of no importance since they have had and can have no further influence upon such conclusions.

The decree of the Court below will be affirmed with costs to the appellee.

*Decree affirmed with costs to the appellee.*

(Decided May 17th, 1905.)